IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FRONTIER MEDICAL, INC.,

     Plaintiff,

vs.

No. CIV 99-1117 PK/RLP

PRESBYTERIAN HEALTHCARE
SERVICES, INC., a New Mexico
corporation d/b/a LINCOLN COUNTY
MEDICAL CENTER and/or LINCOLN
COUNTY MEDICAL CENTER,
PRESBYTERIAN MEDICAL
SERVICES, INC., a New Mexico
corporation, HOME HEALTH
SERVICES OF LINCOLN COUNTY, a
New Mexico corporation, and JOHN
AND JANE DOES NOS. 1 THROUGH
25, individually,

     Defendants.

MEMORANDUM OPINION AND ORDER

THIS MATTER comes on for consideration of Defendant Presbyterian Medical

Services, Inc.'s ("PMSI") Motion for Summary Judgment, filed November 1, 2000.

(Doc. 59).  Defendant Presbyterian Healthcare Services, Inc. ("PHS") joins the motion.

(Doc. 61.)  Upon consideration whereof, the motion is granted.

    (1)    <u>Background</u>:  This action concerns the alleged practice of PHS, doing

business as Lincoln County Medical Center ("LCMC"),[1] of referring

patients in need of hospice or home health care to PMSI, formerly Home

Health Services of Lincoln County ("HHSLC"), rather than to Frontier.[2]

The time period covered by the Second Amended Complaint begins in

November 1995, when Frontier opened for business, and extends "until

Defendants cease and desist from engaging in the [challenged] practices . . .

."  Second Am. Compl. at 4, ¶ 10 (Doc. 40).  Frontier and PMSI are home

health care providers, located in Ruidoso, in Lincoln County, New Mexico.

LCMC, an acute care hospital facility, is also located in Ruidoso.  Home

health care includes skilled nursing, physical therapy, speech therapy,

occupational therapy, infusion therapy, medical social work, and other

personal care performed by skilled (e.g., registered nurses) or unskilled

(e.g., home health care aides) health care workers.  Doc. 40 at 6, ¶ 19.  As

the term suggests, patients receive home health care from workers who

come to their homes.  Hospice care refers to care provided for terminally ill

patients, either at a live-in facility or at the patient's home.  Id. at 6, ¶ 20.

Generally, patients under hospice care have elected to "abandon aggressive

treatment . . . in favor of pain management and palliative care."  Id.

---

[1] LCMC is also named as a defendant.

[2] For the sake of simplicity, the remainder of this order refers to PHS and
LCMC as "LCMC," and to PMSI and HHSLC as "PMSI".

(2)    Summary Judgment:  Defendants LCMC and PMSI have moved for

summary judgment on the issue of market power.  Doc. 59; Doc. 61.

Summary judgment is appropriate where "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  The "movant bears the burden of showing the absence of

a genuine issue of material fact . . . ."  Kaul v. Stephan, 83 F.3d 1208, 1212

(10th Cir. 1996) (citation omitted).  To do so, "the movant need not negate

the non-movant's claim, but need only point to an absence of evidence to

support [that] claim."  Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986) ("[A] complete failure of proof concerning an essential element

of the nonmoving party's case necessarily renders all other facts

immaterial.").  After the movant has met its initial burden, the burden then

shifts to the nonmoving party to "offer evidence of specific facts that is

sufficient to raise a 'genuine issue of material fact.'"  BancOklahoma

Mortg. Corp. v. Capital Title Co., 194 F.3d 1089, 1097 (10th Cir. 1999)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

It is important to note that "the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment."  Anderson, 477 U.S. at 247-48.

- 3 -

In order to establish a genuine issue of material fact, Frontier must present sufficient evidence for a jury to return a verdict in its favor.  Id. at 249.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (citations omitted).  "[T]he Supreme Court has rejected the contention that antitrust plaintiffs 'can get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial' to support the allegations."  2 Phillip E. Areeda, Roger D. Blair, & Herbert Hovenkamp, Antitrust Law ¶ 308a, at 80 (2d ed. 2000) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289-90 (1968)).

(3)    Defendants Have Not Conceded the Truth of Frontier's Allegations:
Frontier's first and most novel argument in opposition to summary judgment is its contention that the defendants, by listing the allegations relevant to their motion, had conceded the truth of those allegations, including their own market and monopoly power.  Frontier Opp'n to Summ. J. at 5-7, 13-14 (Doc. 62).  This argument is not well-taken.  PMSI listed the allegations at issue in a subsection titled "Relevant Allegations in Frontier's Second Amended Complaint."  PMSI Mem. in Supp. of Summ. J. at 2 (Doc. 60).  Each sentence in that subsection begins with the words "Frontier's complaint alleges that . . . ."  It is clear to the court that PMSI has not conceded the truth of these allegations, but merely listed them for

the sake of convenience and clarity.

(4)     Count I:  Count I of Frontier's Second Amended Complaint [hereinafter

"Complaint"] alleges violations of § 1 of the Sherman Act, which prohibits

"[e]very contract, combination in the form of trust or otherwise, or

conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations . . . ."  15 U.S.C. § 1.  Specifically, Count I alleges that

Defendant PHS, doing business as LCMC, conspired or otherwise acted in

concert[3] with Defendant PMSI to "wrongfully steer" LCMC patients in

need of hospice or home health care to PMSI, rather than to Frontier.  Doc.

40 at 2, 15-18.  As a result, Frontier alleges that it has not received "the

legal and/or proportionate number of referrals for home health care and

hospice business from LCMC . . . to which it is entitled" and claims

damages of at least $1,500,000, as well as punitive damages and attorneys'

fees and costs.  Id. at 17-18.

(5)     Antitrust Injury:  Sections 4 and 16 of the Clayton Act provide causes of

action for private parties to recover treble damages and secure injunctive

relief to redress violations of the Sherman Act.  15 U.S.C. §§ 15, 26.  In

order to establish standing under the Clayton Act, a private party must show

---

[3] Although the record before the court is devoid of any evidence of
concerted action, the defendants have conceded the point for the purpose of
this motion.  Doc. 60 at 4, 9 n.3; Doc. 61 at 2.

that it suffered an antitrust injury.  Brunswick Corp. v. Pueblo

Bowl-O-Mat, Inc., 429 U.S. 477, 485-89 (1977) (§ 4, for treble damages);

Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 113 (1986) (§ 16,

for injunctive relief).  An antitrust injury is an "injury of the type the

antitrust laws were intended to prevent and that flows from that which

makes defendants' acts unlawful."  Atlantic Richfield Co. v. USA

Petroleum Co., 495 U.S. 328, 334 (1990) (quoting Brunswick, 429 U.S. at

489).  Simple causation is not enough -- an injury "causally related to an

antitrust violation . . . will not qualify as antitrust injury unless it is

attributable to an anti-competitive aspect of the practice under scrutiny,

since it is inimical to the antitrust laws to award damages for losses

stemming from continued competition."  Atlantic Richfield, 495 U.S. at

334 (internal quotations and citations omitted, emphasis added).[4]

Frontier's Complaint does invoke §§ 4 and 16 of the Clayton Act,

but neither the complaint nor any other pleading specifies the "antitrust

---

[4] An alleged antitrust injury "deserves particularly intense scrutiny" when
the plaintiff is a competitor rather than a consumer.  Indiana Grocery, Inc.
v. Super Valu Stores, Inc., 864 F.2d 1409, 1419 (7th Cir. 1989); see also
SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 965 (10th Cir. 1994)
(citing Chicago Prof. Sports Ltd. Partnership v. NBA, 961 F.2d 667, 670
(7th Cir. 1992)).  This exacting scrutiny stems from the well-settled
principle that "the antitrust laws were passed for 'the protection of
competition, not competitors.'"  Brooke Group Ltd. v. Brown &
Williamson Tobacco Corp., 509 U.S. 209, 224 (1993) (quoting Brown Shoe
Co. v. United States, 370 U.S. 294, 320 (1962)).

injury" on which its right of action under that Act is premised.  Although
both LCMC (through PHS) and PMSI noted Frontier's failure to allege an
antitrust injury in their Answers, PMSI Answer at 4 (Doc. 43); PHS Answer
at 8 (Doc. 44), neither defendant has briefed the issue in the motions
currently before the court.  Without the benefit of briefing, the court will
assume arguendo that Frontier's lost business and eventual closure
constitute antitrust injuries. Holt Aff. at ¶ 10, underline attached to Doc. 62.  In other
words, the court assumes that Frontier's troubles are attributable to
"anti-competitive aspect[s] of the practice under scrutiny," Atlantic
Richfield, 495 U.S. at 334, rather than a simple failure to succeed in a
competitive market.

(6)   Characterization of Alleged Restraint:  The parties agree that home health
care and hospice agencies are "on a lower level of the distribution chain"
than hospitals.  Doc. 40 at 6-7, ¶ 23; Doc. 60 at 5; see also Doc. 61 at 1
(incorporating arguments in PMSI's motion and supporting memorandum).
Accordingly, the alleged agreement between LCMC and PMSI is most
appropriately characterized as a vertical, non-price restriction.  See
Business Elec. Corp. v Sharp Elec. Corp., 485 U.S. 717, 730 (1988);
Antitrust Division, Dep't of Justice, Vertical Restraints Guidelines (Jan. 23,
1985), 50 Fed. Reg. 6263, 6264 (Feb. 14, 1985) [hereinafter "Vertical
Restraints Guidelines"]; e.g., Coffey v. Healthtrust, Inc., 955 F.2d 1388,

- 7 -

1392 (10th Cir. 1992) (hospital and radiologists); Leyba v. Renger, 874 F. Supp. 1229, 1240 (D.N.M. 1994) (hospital and anesthesiologists).  It is well-settled that vertical restraints may have numerous procompetitive virtues.  Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 54-57 (1977); Vertical Restraints Guidelines, 50 Fed. Reg. at 6264, 6266-67. Accordingly, "such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect."  Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984); accord State Oil Co. v. Khan, 522 U.S. 3, 22 (1997).  The fact that this case arises in the health care services industry supplies an additional reason to employ the rule of reason.  Diaz v. Farley, 215 F.3d 1175, 1184 (10th Cir. 2000).

(7)     The Rule of Reason:  Under a rule of reason analysis, the court first considers whether the defendants' conduct has had a substantially adverse effect on competition.  Law v. NCAA, 134 F.3d 1010, 1019 (10th Cir. 1998).  When and if the plaintiff makes this showing, the burden shifts to the defendants to justify those anticompetitive effects by demonstrating that the challenged conduct also has procompetitive virtues.  Id.  If the defendants' actions are justified, the burden shifts back to the plaintiff to show either that the challenged conduct is not reasonably necessary to achieve the defendants' legitimate objectives, or that those objectives can

be achieved in a substantially less restrictive manner.  Id.

(8)  Anticompetitive Effects:  A plaintiff may establish anticompetitive effects

in two ways: either directly, "by showing actual anticompetitive effects,

such as control over output or price," or indirectly, by proving that the

defendant possesses market power -- i.e., the power to raise prices by

restricting output -- within a defined market.  Id.  If the plaintiff can show

"actual anticompetitive effects," the court takes only a "quick look" and

proceeds to the second stage in the rule of reason analysis: the defendants'

procompetitive justifications.  Id. at 1020, cited with approval in Cal.

Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999); see generally NCAA v.

Bd. of Regents of Univ. of Okla., 468 U.S. 85, 109-110 & n.39 (1984)

("The essential point is that the rule of reason can sometimes be applied in

the twinkling of an eye.") (quotations and citation omitted).  There is no

need to define the relevant market under a "quick look" analysis.  Law v.

NCAA, 134 F.3d at 1020.  In this case, the record contains no evidence

suggesting that the referral practices at issue have had any actual

anticompetitive effects -- e.g., predatory pricing, monopoly pricing, price

discrimination, or an artificial reduction in the availability of hospice or

home health care.  Frontier's alleged loss of anticipated profits is not

enough.  See, e.g., Atlantic Richfield, 495 U.S. at 338 ("To hold that the

antitrust laws protect competitors from the loss of profits due to

- 9 -

[nonpredatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share.") (quoting Cargill, 479 U.S. at 116) (alteration in original).  Accordingly, a "quick look" analysis is inappropriate in this case.

(9)   Market Power:  If a plaintiff alleging a vertical restraint cannot demonstrate actual anticompetitive effects, the court must define the relevant upstream and downstream markets – both by product and by geographical region – and examine the defendants' "market power" therein.  See, e.g., Vertical Restraints Guidelines, 50 Fed. Reg. at 6272 (setting out standards for "defin[ing] the relevant markets at each level of distribution affected by the restraint").  "Market power is usually stated to be the ability of a single seller to raise price and restrict output, for reduced output is the almost inevitable result of higher prices."  Fortner Enter., Inc. v. U.S. Steel Corp., 394 U.S. 495, 503 (1969).  Throughout this litigation and on the record, all of the parties have agreed that the plaintiff's inability to show that the defendants exercised market power would be dispositive of the action.[5]  Cf. SCFC, 36 F.3d at 965 (noting that if a defendant lacks market power, the

_____

[5] In its Opposition to Summary Judgment, however, Frontier claims that the "issue is not dispositive inasmuch as a monopoly and anti-competitive action can be proven without a Plaintiff having to prove market power." Doc. 62 at 12 (citing Law v. NCAA, 134 F.3d 1010, 1919 (10th Cir. 1998)).  This contention is without merit and is addressed infra at ¶ 15.

allegedly offensive practice is very unlikely to have an anticompetitive

effect because "consumers are free to shop around to find a rival offering a

better deal").  To that end, the parties have repeatedly sought stays of

discovery pending resolution of the market power issue.  <u>See</u> Order (Sept.

20, 2000) (Doc. 57); Unopposed Mot. for Stay of Discovery (Sept. 12,

2000) (Doc. 56); Order (Aug. 25, 2000) (Doc. 55); Letter by C. Hyer,

Counsel for Frontier, to Court (Aug. 18, 2000).

(10)  <u>Defining the Relevant Markets</u>:  To define the relevant market, the court

must examine the reasonable interchangeability of products, <u>see</u> <u>United</u>

<u>States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 404 (1956),

including any available substitutes, <u>see</u> <u>SCFC</u>, 36 F.3d at 966 (citing

<u>Rothery Storage & Van Co. v. Atlas Van Lines, Inc.</u>, 792 F.2d 210, 218

(D.C. Cir. 1986)), as well as the geographic market for the product.  <u>See</u>

<u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 324 (1962).  In this case,

both the upstream and downstream product markets are actually service

markets -- <u>i.e.</u>, the markets for hospital care and home health care,

respectively.  The parties have not indicated that any substitutes for these

services exist.

(11)  <u>Defining the Geographic Markets</u>:  "The relevant geographic market is not

defined in terms of the locale where the seller attempts to sells its product

or services, but rather is defined by the area where customers would look to

buy such a product or service." <u>Delaware Health Care, Inc. v. MCD Holding Co.</u>, 893 F. Supp. 1279, 1289 (D. Del. 1995) [hereinafter "<u>Delaware Health Care I</u>"] (citing <u>Tunis Bros. Co. v. Ford Motor Co.</u>, 952 F.2d 715, 726 (3d Cir.), <u>cert. denied</u>, 505 U.S. 1244 (1992)); <u>see also</u> <u>Tampa Elec. Co. v. Nashville Coal Co.</u>, 365 U.S. 320, 327, 331-32 (1961) (describing the relevant geographic area as "the market area in which the seller operates, <u>and to which the purchaser can practicably turn for supplies</u>" or as the area in which suppliers "effectively compete") (emphasis added). For purposes of this motion, the parties have stipulated to the following allegations: (1) that the relevant geographical region -- presumably, for both markets -- is Lincoln County and Otero County, adjacent counties in central southern New Mexico; and (2) that the only two competitors in the downstream (home health care) market are PMSI and Frontier. <u>See</u> Doc. 60 at 9 n.3; Doc. 61 at 1, 3; Doc. 40 at 5, ¶ 13.

The court <u>may</u> accept the parties' stipulation as to the appropriate geographical region for the purpose of reviewing a motion for summary judgment. <u>E.g.</u>, <u>Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.</u>, 783 F.2d 159, 162 n.1 (10th Cir. 1986). In this case, however, the stipulated region is so underinclusive that to accept it would pose an unacceptably high risk of creating an illusion of market power where none in fact exists. <u>Cf.</u> <u>Delaware Health Care, Inc. v. MCD Holding Co.</u>, 957 F. Supp. 535, 541

(D. Del. 1997), aff'd, 141 F.3d 1153 (3d Cir. 1998) [hereinafter "Delaware Health Care II"].  At the very least, both geographic markets would have to include the southwestern portion of Chaves County, which is physically contiguous to the stipulated region.  No reasonable trier of fact could find that the geographic markets did not include, at least, the southwest corner of Chaves County.  More importantly, the evidence currently before the court demonstrates that the geographic market within which LCMC competes for consumers of hospital care is quite different -- in fact, much larger -- than the market within which PMSI competes for consumers of hospice and home health care.

For example, an audit of patient charts at PMSI reveals that PMSI receives patient referrals not only from LCMC, the hospital in PMSI's service area, but also from numerous hospitals outside the stipulated region, including hospitals in Albuquerque, Las Cruces, and Roswell, New Mexico; Phoenix, Arizona; and El Paso, Texas.  PMSI Patient Chart Audit Results, attached to Doc. 62.  Unlike the market for hospice and home health care services, in which consumers are naturally limited to providers who are within reasonable commuting distance of the patients' homes, the market in which LCMC competes includes consumers who are willing and able to travel much further.  See id.; see also Vertical Restraints Guidelines, 50 Fed. Reg. at 6268 ("The upstream market . . . frequently will have a much

greater geographical scope than the downstream market.").  Thus, in order
to analyze Frontier's § 1 claim, it is not enough to determine whether PMSI
and LCMC have "market power" in the immediate service area.  The court
must also determine LCMC's power within the larger geographical region
in which it actually competes for consumers of hospital services -- i.e.,
LCMC's market share must be examined in relation to the shares held by
other hospitals that draw patients from LCMC's immediate service area.
See Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 346 (8th Cir. 1995)
("What we really need to know is the extent to which people from the
immediate area can readily turn to alternative sellers . . . .") (quoting
Herbert Hovenkamp, Federal Antitrust Policy § 3.6d, at 113-14 (1994)).
Even assuming an agreement between LCMC and PMSI that all LCMC
patients in need of home health care will be referred to PMSI upon
discharge, the effect of that agreement on competition in the local home
health care market is entirely dependent on how many potential
PMSI/Frontier customers are discharged from other hospitals.  The court
has absolutely no information as to this critical point.

As explained, the evidence before the court shows that among
patients who reside in PMSI's (and LCMC's) immediate service area,
LCMC competes with hospitals in Albuquerque, Alamogordo, Las Cruces,
and Roswell, New Mexico; Phoenix, Arizona; and El Paso, Texas.  PMSI

Chart Audit Methodology, underlined attached to Doc. 62.  Yet there is no evidence in the record regarding the overall size of the market in which these hospitals compete, nor is there any evidence as to the market shares held by each competitor.  Without evidence to define the upstream geographic market, it is impossible for the court to assess LCMC's market power therein.  See Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 893 (10th Cir. 1991) ("Without a definition of the relevant market for the product involved, there is no way to measure the defendant's ability to lessen or destroy competition.") (citation omitted).  In order to show that there is no genuine issue as to any material fact, "the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  Kaul, 83 F.3d at 1212; Celotex, 477 U.S. at 322-23; cf. All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc., 135 F.3d 740, 749 (11th Cir. 1998) (sustaining jury verdict for defendants based on plaintiffs' failure to establish the relevant market: "[b]ecause no definable market was proved, plaintiffs could show no adverse effect on competition").  Thus, the court concludes that there is no issue of material fact as to LCMC's market power.  Because LCMC's market power is an essential element of Frontier's § 1 claim, the defendants are entitled to summary judgment on that claim as a matter of law.  Cf., e.g., Miller v. Indiana Hosp., 814 F. Supp. 1254, 1262-63 (W.D. Pa.), aff'd,

- 15 -

975 F.2d 1550 (3d Cir. 1992) (holding that evidence of service area was insufficient at summary judgment to establish relevant geographic market), cert. denied, 507 U.S. 952 (1993).

(12)   Referrals by LCMC-Employed Doctors Who Work Outside the Hospital: Because the parties have devoted so much space and energy to the issue of referrals by LCMC-employed doctors working outside the hospital, the court will briefly address that dispute.  In short, the court concludes that in the absence of evidence as to each defendant's market power in its respective market, the number of referrals from LCMC to PMSI, Frontier, or other home health care agencies is immaterial.  See Celotex, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").  Accordingly, it is unnecessary to decide whether the Second Amended Complaint may be read to allege that referrals by LCMC-employed doctors, working outside the hospital, constitute referrals by LCMC itself, and if not, whether Frontier should be permitted to amend its Complaint at this stage in the litigation.  Even if the referral numbers were material, the evidence in the record, considered in the light most favorable to Frontier, is not "significantly probative" as to create a genuine issue.  See Anderson, 477 U.S. at 249.

(13)   Count II:  Count II of Frontier's Complaint alleges violations of § 2 of the

Sherman Act, which provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . , shall be deemed guilty of a felony . . . ."  15 U.S.C. § 2. Frontier alleges that as a result of the defendants' violations of § 2, it has lost business "to which it is entitled," and it claims "actual, special, consequential and incidental damages" of at least $1,500,000, as well as punitive damages, and attorneys' fees and costs.  Doc. 40 at 20-21. Frontier relies on two theories in support of its § 2 claim.[6]  First, Frontier asserts that it need not demonstrate market power in order to demonstrate defendants' monopoly.  Doc. 62 at 11-13.  Second, Frontier claims that

---

[6] Despite Frontier's obvious familiarity with factually analogous referral cases such as Delaware Health Care, Inc. v. MCD Holding Co., 893 F. Supp. 1279 (D. Del. 1995), and Advanced Health-Care Services, Inc. v. Radford Community Hosp., 910 F.2d 139 (4th Cir. 1990), both of which were cited in Frontier's Response to Defendants' Rule 12(b)(6) Motion to Dismiss at 4, 5, 15 (Doc. 15), Frontier never argued that LCMC was attempting to monopolize the home health care market by leveraging its monopoly position in the hospital market.  See Delaware Health Care I, 893 F. Supp. at 1288, 1289-90 (analyzing § 2 challenge to hospital/home health care referral policy under attempted monopoly/leveraging theory); Advanced Health-Care, 910 F.2d at 149-50 (4th Cir. 1990) (same); see also Delaware Health Care II, 957 F. Supp. at 540-46 (same); Key Enter. of Delaware, Inc. v. Venice Hosp., 919 F.2d 1550, 1565-68 (11th Cir. 1990) (same), vacated as moot, 9 F.3d 893 (11th Cir. 1993).  Of course, in order to succeed on such a claim, Frontier would need to establish the geographic boundaries of the market for hospital care, as well as LCMC's share of that market.

LCMC is an "essential facility," to which Frontier has been denied access in violation of § 2.  Id. at 13-14; see also Doc. 40 at 8, ¶ 27A.  The court will address Frontier's § 2 arguments in reverse order.

(14)   The Essential Facilities Doctrine:  Under the essential facilities doctrine, the plaintiff must show that:  (1) the defendant is a monopolist in control of a facility that is essential to competition in the relevant market; (2) the plaintiff is unable to duplicate, practically or reasonably, the essential facility;  (3) the defendant has denied the plaintiff the use of the essential facility;  and (4) it is feasible for the defendant to provide the facility to the plaintiff.  City of Chanute, Kan. v. Williams Natural Gas Co., 955 F.2d 641, 647-48 (10th Cir. 1992) (citations omitted), overruled on other grounds, Systemcare, Inc. v. Wang Lab. Corp., 117 F.3d 1137 (10th Cir. 1997) (en banc) (relating to § 1); see also SCFC, 36 F.3d at 971 n.19 (citing Associated Press v. United States, 326 U.S. 1 (1945), and United States v. Terminal R.R. Ass'n, 224 U.S. 383 (1912), as the roots of the essential facility doctrine).  In this case, the first element requires that Frontier show that LCMC is a monopolist in the hospital market, and that access to LCMC is essential for control in the hospice and home health care market.  As explained, Frontier has failed to establish the geographic region relevant to the hospital market.  Accordingly, Frontier cannot establish the first element of its essential facilities claim, and the claim must fail.

(15)    Frontier relies on <u>Law v. NCAA</u>, 134 F.3d 1010 (10th Cir. 1998), for the

proposition that "a monopoly and anti-competitive action can be proven

without a Plaintiff having to prove market power."  Doc. 62 at 12 (emphasis

omitted).  The court is not persuaded.  In <u>Law v. NCAA</u>, the Tenth Circuit

held that "[n]o 'proof of market power' is required <u>where the very purpose</u>

<u>and effect of a horizontal agreement is to fix prices</u> so as to make them

unresponsive to a competitive market price."  134 F.3d at 1020 (emphasis

added).  Because the present case involves a vertical, non-price agreement,

<u>Law</u> is inapplicable.

(16)    <u>Monopolization</u>: Thus, in order to prevail on a claim for monopolization

under § 2 of the Sherman Act, Frontier must establish: "(1) the possession

[by defendants] of monopoly power in the relevant market and (2) the

willful acquisition or maintenance of that power as distinguished from

growth or development as a consequence of a superior product, business

acumen, or historic accident."  <u>United States v. Grinnell Corp.</u>, 384 U.S.

563, 570-71 (1966).  "Monopoly power under § 2 requires, of course,

something greater than market power under § 1."  <u>Eastman Kodak Co. v.</u>

<u>Image Technical Services, Inc.</u>, 504 U.S. 451, 481 (1992).  In light of the

court's conclusion that the plaintiffs have failed to establish the relevant

market for hospital services, it follows <u>a fortiori</u> that they cannot establish

that LCMC exercises monopoly power within that market.  Accordingly,

- 19 -

the defendants are entitled to summary judgment on the § 2 claim as well.

(17)    <u>Pendent Claims</u>:  Counts IV through VI allege pendent claims arising under New Mexico statutory and common law.  In light of the disposition of Frontier's federal claims, the court declines to exercise jurisdiction over the state claims.  <u>See</u> 28 U.S.C. § 1367(b).

(18)    <u>John and Jane Doe Defendants</u>:  In addition to PHS, LCMC, PMSI, and HHSLC, Frontier's Complaint also names "John and Jane Does Nos. 1 Through 25" as defendants.  Doc. 40 at 1 & 4, ¶ 9.  If a defendant's name is unknown at the time a complaint is filed, a plaintiff may use a fictitious name to designate that defendant and amend the complaint after the defendant has been identified through discovery.  <u>See, e.g.</u>, <u>Dean v. Barber</u>, 951 F.2d 1210, 1215-16 (11th Cir. 1992).  An action cannot be maintained, however, against unnamed defendants whom the plaintiff has failed to identify despite ample opportunity for discovery.  <u>See</u> <u>Colle v. Brazos County, Tex.</u>, 981 F.2d 237, 243 (5th Cir. 1993) (affirming dismissal of suit against unnamed defendants for failure to prosecute where the defendants remained unnamed for three years); <u>cf.</u> <u>Roper v. Grayson</u>, 81 F.3d 124, 126 (10th Cir. 1996) (reversing dismissal of claims against unnamed defendants where the plaintiff provided an adequate description to identify the persons involved).  In this case, Frontier has not identified "John and Jane Does Nos. 1 Through 25" by name or description, nor has Frontier filed a Rule

56(f) affidavit to explain this failure and request additional discovery to remedy it.  <u>See</u> Fed. R. Civ. P. 56(f).  Frontier's suggestion that the John and Jane Doe designations "can be considered" to refer to LCMC-employed doctors who work outside the hospital is too vague to survive summary judgment.  <u>See</u> Doc. 62 at 10.  On its own motion, the court therefore orders that John and Jane Does Nos. 1 Through 25 are also entitled to summary judgment, and dismisses all claims against them.  The federal claims are dismissed with prejudice; the state claims are dismissed without prejudice.  The March 20, 2001, trial setting in this matter is vacated.

IT IS SO ORDERED.

DATED this <u>1st</u> day of February, 2001, at Santa Fe, New Mexico.


*Paul Kelly J.*
_____
United States Circuit Judge
Sitting by Designation

Counsel:

Calvin Hyer, Jr., Spann, Hyer, Hollowwa & Artley, Albuquerque, New Mexico, for Plaintiff.

Thomas C. Bird and David W. Peterson, Keleher & McLeod, P.A., Albuquerque, New Mexico, for Presbyterian Medical Services, Inc.

Edward Ricco and Bruce Hall, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico, for Defendant Presbyterian Healthcare Servs. d/b/a Lincoln County Medical Center.

- 21 -